## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **FRANCISCO MUNDACA,** | ) | |
| **1104 Meredith Lane** | ) | |
| **Davidsonville, MD 21035** | ) | |
| **County: Anne Arundel** | ) | **CIVIL ACTION NO.: 1:25-cv-2036** |
| | ) | |
| *Plaintiff*, | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **THE SPIGGLE LAW FIRM, P.C.,** | ) | |
| **3601 Eisenhower Avenue, Suite 425** | ) | |
| **Alexandria, VA 22304** | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff Francisco Mundaca ("Plaintiff" or "Mr. Mundaca") brings this Complaint against Defendant The Spiggle Law Firm, P.C. ("Defendant" or "TSLF" or "the Firm") to redress violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the Maryland Fair Employment Practices Act, MD Code § 20-606 *et seq.* ("MFEPA"), and breach of contract. As a result, Mr. Mundaca has incurred significant financial hardship and suffered emotional harm. Mr. Mundaca seeks back pay, front pay, compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and all other relief to which he may be entitled under federal and Maryland law.

## NATURE OF THE CLAIMS

1.      TSLF employed Mr. Mundaca, a passionate and dedicated lawyer with over 16 years of experience, as an Attorney from September 2019 through May 2021, Managing Attorney from 2021 through March 2024, and Managing Partner from March 2024 through January 2025. During his tenure at TSLF, Mr. Mundaca consistently exceeded expectations and made significant contributions to the Firm's success by building strong client relationships,

generating substantial business, providing excellent legal advice both internally and externally, developing successful legal strategies, as well as structuring and supervising the entire legal department.

2.      Despite Mr. Mundaca's stellar performance and leadership, TSLF subjected him to racial discrimination, disparate treatment, and retaliation—the very conduct for which he was employed to fight against. From the moment of his hire, TSLF purposefully misled Mr. Mundaca about career advancement and equity partnership with the Firm. The Firm also systematically limited Mr. Mundaca's ability to succeed and took active steps to limit his earning potential. TSLF's treatment of Mr. Mundaca was in stark contrast to how the Firm treated its White leaders and Mr. Mundaca's counterparts. These discriminatory policies and practices resulted in TSLF refusing to promote Mr. Mundaca to Equity Partner with commensurate pay and benefits for the work he was already performing and the efforts he was already leading.

3.      Additionally, TSLF intentionally retaliated against Mr. Mundaca after he complained about the Firm's racially disparate pay practices related to the only other attorney of color by stripping him of the opportunity for equity partnership, removing him from pay and performance processes he previously led, restricting his ability to grow his practice, stifling his professional growth and earning potential, and ultimately terminating his employment under the guise of having different "visions," and not as a result of his performance. It was well-known within TSLF and externally that Mr. Mundaca was a well-regarded and high-performing attorney.

**PARTIES**

4.      Plaintiff, Mr. Mundaca, is an individual and resident of Davidsonville, Maryland. TSLF employed Mr. Mundaca from September 2019 through January 2025. Mr. Mundaca is Latino and of Hispanic origin. Mr. Mundaca was the Firm's only Latino attorney

2

throughout his employment with TSLF. Throughout his employment with TSLF, Mr. Mundaca primarily performed work for the Firm remotely, from his home within the District of Maryland.

5.      Defendant TSLF is a professional corporation based in Alexandria, Virginia. Tom Spiggle ("Mr. Spiggle"), White male and TSLF's Named Partner, and Brian Formagus ("Mr. Formagus"), White male and TSLF's Chief Executive Officer ("CEO") make up the Firm's leadership. TSLF also maintains a place of business at 1910 Towne Centre Blvd., Suite 250-209, Annapolis, Maryland 21401.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under Section 1981.

7.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff's claims under Section 1981 are brought to recover damages for deprivation of equal rights.

8.      This Court also has supplemental jurisdiction to hear Plaintiff's claims brought pursuant to the laws of Maryland pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)–(c) because Defendant conducts business in this district, maintains an office in this district, and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district.

## ADMINISTRATIVE REMEDIES

10.     Section 1981 does not require Plaintiff to exhaust any administrative remedies before filing this Complaint in federal court.

11.     On March 12, 2025, Plaintiff filed a Charge of Discrimination alleging race and national origin discrimination and retaliation with the United States Equal Employment

Opportunity Commission ("EEOC"). **(Exhibit A).**

12.     When Plaintiff receives his Notice of Right to Sue from the EEOC, he will seek to amend this Complaint to add claims of violations of 42 U.S.C. §2000e ("Title VII").

## FACTUAL ALLEGATIONS

### Mr. Mundaca Exhibited Excellent Performance and Leadership Throughout His Tenure with TSLF.

13.     TSLF is a mid-sized Firm located in Alexandria, Virginia which primarily practices employment litigation, representing plaintiffs and employees.

14.     At any one time of over the past 5 years, TSLF has employed approximately 5-10 lawyers and approximately 5-10 staff members.

15.     TSLF hired Mr. Mundaca, a passionate and dedicated lawyer with over 16 years of experience, as an Attorney in September 2019 with the goal of expanding the Firm's practice areas to include cases outside of employment law, like business litigation and criminal law. However, he received authority to originate matters outside of the areas mentioned herein.

16.     During his tenure at TSLF, Mr. Mundaca consistently exceeded expectations and meaningfully contributed to the Firm's success by building strong client relationships, providing excellent legal advice and services, successfully litigating complex legal cases, and generating substantial business for the firm. Beyond this, Mr. Mundaca actively mentored and trained all attorneys, paralegals, and legal assistants, equipping them with litigation skills and instilling best practices to improve efficiency across the firm.

17.     For six years, Mr. Mundaca played a key role in bringing in business at TSLF. He brought in numerous high-value clients, strengthened referral networks, and he was frequently the only attorney that represented the Firm at industry events.

18.     By his third year at TSLF, Mr. Mundaca was managing the practice, handling substantial responsibilities, and taking on liability under all his licenses for cases outside of Mr.

4

Spiggle's admitted jurisdictions. Mr. Spiggle, TSLF's Founding Partner, is only barred in Virginia, Washington D.C, and North Carolina. Whereas Mr. Mundaca is barred in Maryland, Washington, D.C., Virginia, Texas, and New York. It was well-known within the Firm that Mr. Spiggle no longer practices. In fact, Mr. Spiggle has not practiced since at least when Mr. Mundaca joined the firm in 2019, and despite being admitted in a small number of jurisdictions, Mr. Spiggle never entered his appearance on matters, nor was he a participant in case management. Rather, the Firm required Mr. Mundaca to enter his appearance in all matters filed in courts.

19.     Likewise, Mr. Mundaca supervised all attorneys within the Firm. He not only managed their workloads but also provided direct mentorship, guided litigation strategies, and ensured that cases were handled efficiently. In addition to interviewing, hiring, and managing the Firm's 3-7 attorneys, Mr. Mundaca also supervised support staff, such as paralegals and law clerks, often supervising 15+ individuals at any one time. He had responsibility over accounts receivables, client complaints, and overall case management—duties typically handled by Firm leadership, not a Staff Attorney. Meanwhile, Mr. Spiggle and Mr. Formagus took no part in the day-to-day operations of the Firm, instead focusing on marketing and "sales.[1]" They remained absent from the practical management of cases, networking events, attorney oversight, or client interactions, leaving Mr. Mundaca to assume the responsibilities they neglected.

20.     Throughout his entire tenure and career as an attorney, Mr. Mundaca never received a single disciplinary infraction, had any performance issues, or received a complaint from a client or colleague.

---

[1] Mr. Spiggle employs a questionable practice of employing a sales team of 3-4 individuals that perform prospective client intakes and discuss the terms of TSLF's retainers, prior to the prospective client's contact with a staff attorney. In many instances, these practices often walked a fine line where non-attorneys provided legal advice to convert a prospective client into a client, irrespective of the strength of their claims.

**TSLF Promoted Mr. Mundaca to Managing Attorney, After Years of Failing to
Reward His Leadership and Contributions to the Firm.**

21.    Between 2019 and 2021, Mr. Mundaca requested promotions and equity partnership, commensurate with the responsibilities he had already assumed, the staff he oversaw, his supervision of complex cases, and many other responsibilities he handled far beyond his official title. Mr. Mundaca told Mr. Spiggle and Mr. Formagus that if he continued assuming these responsibilities, he needed a managerial title and clear assurances of equity in the Firm.

22.    In January 2021, instead of considering the prospect of promoting their only Latino attorney into leadership—one who was essentially performing the duties of leadership without the formal title or accompanying increase in pay, Mr. Spiggle and Mr. Formagus began an external search for a Managing Attorney.

23.    Naturally, Mr. Mundaca was disheartened and demoralized. He realized he was experiencing the very discrimination that the Firm purported to protect its clients against. In February 2021, Mr. Mundaca finally conjured up the courage to confront Mr. Spiggle and Mr. Formagus about their external search since he had been advocating for years to obtain a leadership role within the Firm. Mr. Spiggle and Mr. Formagus told Mr. Mundaca that they would consider him for the role.

24.    In May 2021, after two years of demands for equitable treatment, the Firm gave Mr. Mundaca the title of Managing Attorney but refused to provide the proper compensation and authority that typically accompany such a position. Industry standards for Managing Attorneys at firms of comparable size range between $175,000 and $220,000, yet Mr. Mundaca was only paid $165,000—well below market rate considering his extensive responsibilities, and approximately $35,000 more than what he earned as a Staff Attorney.

25.    Furthermore, Mr. Mundaca's workload as a Managing Attorney skyrocketed,

6

often reaching 60-to-80-hour work weeks. He oversaw litigation, developed legal strategies, supervised multiple attorneys, and now managed firm operations, yet leadership still excluded him from key decision-making processes.

26.    For example, while Mr. Mundaca attended weekly leadership meetings, these meetings covered a wide-variety of topics including sales, marketing, intake, Mr. Spiggle's desires to author books, ways to monetize a program that Mr. Spiggle created, "Legal Leverage," in order seek compensation from individuals that were unable to pay for legal services, and basic firm administration. However, major firm decisions always occurred before and after these "management" meetings and excluded the individuals the Firm referred to as "leadership."

27.    The White members of leadership (Mr. Spiggle and Mr. Formagus) made all major decisions—such as budget allocations and firm-wide compensation—without Mr. Mundaca's input. As "Managing Attorney," Mr. Mundaca had the most direct insight into the daily operations of the Firm, the challenges attorneys faced, and the resources needed for success. However, Mr. Spiggle and Mr. Formagus, who had little involvement in the Firm's day-to-day operations, made these critical decisions behind closed doors, excluding the Firm's Managing Attorney: Mr. Mundaca.

**TSLF Discriminated Against Mr. Mundaca Based on His Race and National Origin By Intentionally Denying Him Professional Opportunities Despite His Strong Performance.**

28.    Despite Mr. Mundaca's strong performance and leadership, TSLF denied Mr. Mundaca key opportunities— benefits only afforded to White leadership. Most notably, TSLF denied Mr. Mundaca a promotion to equity partner, which severely limited his income earning potential and restricted his ability to grow his practice area.

29.    From the moment Mr. Mundaca joined the Firm, Mr. Spiggle and Mr. Formagus, the Firm's CEO, retained all leadership opportunities for themselves, ensuring that they, as White men, controlled the Firm.

30.     Each year, Mr. Mundaca pushed for equity partnership, and each year, the Firm continued to unilaterally move the goalposts. At first, within Mr. Mundaca's first year, in 2020, Mr. Spiggle dismissed the idea outright, by stating that TSLF did not have a partner track. But the next year, in 2021, Mr. Spiggle could no longer deny Mr. Mundaca's skillset and began to indicate that equity was a viable option and even joked that equity was viable so long as Mr. Mundaca did not want to have a voice in "picking the color of the chairs in the office."  During the conversation, Mr. Spiggle also made it clear that TSLF would not change its name to include "Mundaca." Later, in 2022 and 2023, Mr. Spiggle and Mr. Formagus offered vague assurances that it was "in the cards," and that equity was a certainty, but serious discussions would occur in the near future. Mr. Spiggle and Mr. Formagus confirmed that equity partnership was months, and not years away.

31.     Around this time, in 2022 and 2023, Mr. Spiggle and Mr. Formagus floated the idea of a potential buy-in, or in other words, of Mr. Mundaca purchasing his way into a specific percentage of equity. However, despite repeated assurances that Mr. Mundaca would receive an equity interest in the firm, Mr. Spiggle and Mr. Formagus would only create new excuses to avoid making it a reality—a phenomenon experienced by far too many attorneys of color. The message was clear: Mr. Mundaca was good enough to do the work but under no circumstance would he receive the leadership opportunities or compensation enjoyed by an all-White operational leadership team.

32.     Interestingly, TSLF hired Mr. Mundaca prior to Mr. Formagus' arrival. The Firm hired Mr. Formagus in November 2019 as Chief Operating Officer. By August 2022, the Firm promoted Mr. Formagus to Chief Executive Officer. It was apparent that TSLF had no reservations with promoting Mr. Formagus, a White male, and a non-attorney, to the second highest position within the Firm.

33.     In November 2023, the Firm's Managing Paralegal resigned. Thereafter, Mr. Mundaca assumed the added responsibility for overseeing all the paralegals and legal assistants while managing his own caseload and fulfilling his duties as Managing Attorney. Mr. Mundaca reviewed their work, led weekly meetings, and delegated tasks—effectively running the entire legal department without any additional support. The following month, Mr. Mundaca worked with the marketing team to completely overhaul the Firm's website, letterhead, and business cards, which had been outdated and filled with inaccurate information. This update was critical to maintaining the Firm's professional reputation and ensuring that potential clients had access to accurate details.

34.     At every turn, Mr. Mundaca stepped up to fill leadership gaps and took on the work necessary to ensure the Firm's stability and growth. Instead of recognizing Mr. Mundaca's contributions, Mr. Spiggle and Mr. Formagus exploited his efforts while keeping him locked out of leadership decisions and career advancement.

35.     By early March 2024, after years of reassurances, leadership revoked its commitment to equity partnership. Specifically, Mr. Spiggle and Mr. Formagus, both White men, maintained full control over the Firm while refusing to grant Mr. Mundaca, a Latino attorney, any real authority, despite his central role in operations. Mr. Spiggle and Mr. Formagus abruptly declared that equity partnership was no longer an option. Instead, they pushed Mr. Mundaca into accepting an origination-based compensation structure, framing it as an opportunity to "run his own firm within the Firm," and the authorization to bring other matters outside of the employment law realm.

36.     The origination agreement, effective April 1, 2024, formally changed Mr. Mundaca's title from Managing Attorney to Managing Partner. Under this agreement, Mr. Mundaca was set to receive 40% of all cases originating in New York and Texas, and 30% of all

cases originating in the DMV that were direct referrals to Mr. Mundaca. Leadership also committed to annual raises based on performance and reimbursement for business travel expenses.

37.    Although his title changed to "Managing Partner," leadership denied Mr. Mundaca one of the most significant benefits of that role—equity. His salary remained capped at $220,000, which aligned with the industry standard for a Managing Attorney, not a Managing Partner. One of the greatest benefits of becoming a Managing Partner is ownership in the Firm, something leadership outright refused to grant Mr. Mundaca. While Mr. Mundaca handled the work necessary to run the Firm, Mr. Spiggle and Mr. Formagus were clear that he had no meaningful power. Their actions demonstrated that they had no intention of ever allowing a Latino attorney to share in the Firm's success, reserving true leadership and financial control for themselves as White men.

38.    A major component of the Origination Agreement included language that TSLF would fully support Mr. Mundaca in the development of new practice areas, namely Business Law and Criminal Law—two areas of practice where Mr. Mundaca held significant interest. TSLF had considered the idea of expanding practice areas during the weekly leadership meetings.

39.    During the fall and winter of 2023, the Firm experienced a severe downturn in business. The Firm's call volume dropped drastically, and for several months, the Firm's average monthly case openings dropped from 38 new matters a month to 10 new matters, respectively. The notable downturn led to frequent discussion of layoffs, elimination of raises, and bonuses.

40.    Tired and overworked, Mr. Mundaca offered to create new practice areas to generate more income for the Firm. He also recommended that TSLF open an office in Annapolis, Maryland to extend the reach of the firm's marketing into Baltimore, Maryland. At

the time, Mr. Formagus frequently confided to Mr. Mundaca that this was the best idea for the firm, instead of opening an office in Washington, D.C., as Mr. Spiggle desired.

41.    However, Mr. Spiggle and Mr. Formagus actively restricted Mr. Mundaca's ability to bring in new cases, directly contradicting the terms of the origination agreement. While they initially stated that Mr. Mundaca could take all cases in New York, Texas, and the DC area, they deliberately attempted to limit Mr. Mundaca's practice by requesting that he disengage clients on matters that Mr. Mundaca himself originated. In short, Mr. Spiggle and Mr. Formagus served their existing interests rather than allowing Mr. Mundaca to build a true and independent book of business.

42.    Specifically, Mr. Spiggle and Mr. Formagus refused to market Mr. Mundaca's new business and criminal practice areas outside of Maryland, denied funding for additional marketing when Mr. Mundaca requested it, and even refused to approve business cards. The Firm has always covered these types of business expenses, yet when Mr. Mundaca made requests, leadership blocked every effort. These restrictions prevented Mr. Mundaca from establishing a presence in the high-revenue practices area that Mr. Spiggle and Mr. Formagus had initially encouraged him to develop.

43.    In August 2024, the Firm opened a dedicated Maryland office, reinforcing its strategy to confine Mr. Mundaca's work to that jurisdiction despite his qualifications and the explicit terms of the origination agreement, but realize the increase in revenue for themselves. Mr. Spiggle and Mr. Formagus positioned Mr. Mundaca as the "head" of the Maryland office, meanwhile Mr. Mundaca continued to manage the TSLF's Virginia office, as well. Further demonstrating that they only supported work that aligned with Mr. Spiggle's and Mr. Formagus' plans while impeding Mr. Mundaca's professional development and ultimately his compensation.

44.    At the same time, neither Mr. Spiggle nor Mr. Formagus took any steps to expand Mr. Mundaca's practice outside of Maryland, making it clear that their goal was to limit Mr. Mundaca's career trajectory and income earning potential.

45.    In October 2024, Mr. Spiggle ordered Mr. Mundaca to refer out business-related and contentious litigation matters, again limiting Mr. Mundaca's practice and compensation. On October 10, 2024, Mr. Mundaca received a text message from a potential client seeking representation for a high-value divorce case. This case aligned with the business expansion goals leadership had previously encouraged and discussed with Mr. Mundaca. However, on October 17, 2024, Mr. Spiggle called Mr. Mundaca and ordered him to send the case elsewhere. He claimed that he was also uncomfortable with Mr. Mundaca handling business litigation matters, despite these being profitable practice areas that Mr. Mundaca had prior experience with and had been specifically recruited to develop. This was yet another attempt to cut off Mr. Mundaca's ability to generate revenue and further isolate him, and in direct contradiction to the Origination Agreement and the understanding that TSLF and Mr. Mundaca held.

46.    Then, in December 2024, unbeknownst to Mr. Mundaca, Mr. Spiggle eliminated the business and criminal law practice areas entirely, effectively erasing the practice areas that they initially agreed that Mr. Mundaca could develop.

47.    Instead of communicating this directly with Mr. Mundaca, Mr. Mundaca learned about this through a telephone conversation with a public relations consultant TSLF hired to seek media opportunities for Mr. Spiggle. During this telephone call, the public relations consultant was apologetic to Mr. Mundaca and explained that she did not understand why Mr. Spiggle requested her efforts on publicizing the Firm's expansion into Maryland and the new practice areas, only to discontinue the efforts after a few months. Therein, she expressed concern of reputational harm to herself and to Mr. Mundaca, as well.

48.     The Firm's pattern of discrimination was blatant. Mr. Spiggle and Mr. Formagus created artificial barriers to keep Mr. Mundaca from obtaining true leadership status, ensuring that they alone controlled the Firm's power structure. They lied about equity to keep Mr. Mundaca invested in their success while never intending to share ownership or decision-making power with anyone outside of their White leadership. Mr. Spiggle and Mr. Formagus used Mr. Mundaca (and other brown and black talent) for years, profiting from his work, revenue generation, and leadership while ensuring that he never gained any real career advancement or meaningful promotions.

### TSLF Retaliated Against Mr. Mundaca for Advocating for Pay Equity for a Black Female Attorney.

49.     In May 2023, at Mr. Mundaca's recommendation, the Firm hired Samantha Vanterpool Rucker ("Ms. Rucker"), a Black female attorney. Ms. Rucker was an exceptional attorney with extensive legal experience, strong advocacy skills, and a deep commitment to her clients. She handled complex litigation matters, consistently delivered strong results, and was highly regarded by both clients and colleagues. At the time of her hiring, Ms. Rucker had over 21 years of legal experience.

50.     Ms. Rucker regularly worked 50 or more hours per week, managing a heavy caseload that included complex litigation and contingency matters. She also supervised multiple associates without the support of a senior attorney, further demonstrating her leadership and expertise.

51.     Five months later, in October 2023, the Firm hired Louise Ryder ("Ms. Ryder"), a White female attorney. Ms. Ryder had approximately 11 years of legal experience—ten years fewer than Ms. Rucker.

52.     Despite having significantly less experience, at that time, Ms. Ryder worked a

much lighter schedule, averaging 30-42 hours per week and never exceeding 45 hours. Unlike Ms. Rucker, who managed cases independently and had many contingency cases, Ms. Ryder had the structural support of a senior attorney and carried fewer direct litigation responsibilities.

53.    Shortly after Ms. Ryder's hiring, Mr. Mundaca expressed to both Mr. Spiggle and Mr. Formagus, that despite Ms. Rucker's superior experience, greater workload, and heavier litigation responsibilities, the Firm paid her almost $20,000 less per year than Ms. Ryder. This pay disparity was a blatant example of the Firm's discriminatory compensation practices, as it undervalued a highly experienced Black woman attorney while overcompensating a less experienced White attorney.

54.    Recognizing the clear racial pay disparity, Mr. Mundaca raised concerns in October 2023 with Mr. Spiggle and Mr. Formagus, urging them to increase Ms. Rucker's salary to reflect her experience and contributions. Mr. Formagus dismissed Mr. Mundaca's concerns, claiming that the Firm could not afford the pay increase, and even went as far as performing research to point out that Ms. Rucker had fewer billable hours. A clear indication that Mr. Formagus was absent from day-to-day operations, he was unaware that Ms. Rucker handled a large portion of the Firm's contingency matters. Mr. Mundaca quickly pointed that out to Mr. Formagus.

55.    In December 2023, Mr. Mundaca followed up again, emphasizing that Ms. Rucker was being paid significantly less than her White counterpart despite having comparable skills and responsibilities. Once again, leadership refused to act. As part of their excuses, Mr. Spiggle and Mr. Formagus claimed that the Firm's financial situation prevented them from giving Ms. Rucker a raise. However, their reasoning was disingenuous, as they simultaneously invested in expanding the Firm's workforce, marketing team, and Mr. Spiggle's book, among other things.

56.     Mr. Mundaca continued to advocate for Ms. Rucker's salary adjustment, but leadership deliberately delayed taking any action.

57.     In March 2024, shortly after Mr. Mundaca continued pushing for Ms. Rucker's pay equity, the Firm took its first significant step in retaliating against Mr. Mundaca. After years of assuring Mr. Mundaca that he was on track for equity partnership, Mr. Spiggle and Mr. Formagus abruptly reversed course. Specifically, Mr. Formagus then informed Mr. Mundaca that equity partnership was no longer an option.

58.     In April 2024, Lead Attorney Valerie Teachout ("Ms. Teachout") resigned from the Firm, significantly freeing up payroll funds. Given their previous financial excuse, Mr. Mundaca immediately followed up with Mr. Formagus and Mr. Spiggle, urging them to increase Ms. Rucker's salary now that the Firm had additional available resources.

59.     On April 15, 2024, after several private conversations, and approximately six months after Mr. Mundaca's first complaint to Mr. Spiggle and Mr. Formagus, Mr. Mundaca sent Mr. Formagus a Google Chat message noting that he is "going to recommend that we bump up SVR to the LR/VT salary. We really need to make this right." SVR stands for Samantha Vanterpool Rucker, LR stands for Louise Ryder, and VT stands for Valerie Teachout.

60.     Again, on May 13, 2024, Mr. Mundaca sent Mr. Formagus another Google Chat message recommending a salary increase on behalf of Ms. Rucker. But even with this newly available funding, they continued to stall and refused to act on their own. Nevertheless, Mr. Mundaca persisted in his demands that leadership correct the racial pay disparity, pointing out that with Ms. Teachout's departure, they could no longer claim financial hardship as an excuse.

61.     On May 14, 2024, Mr. Mundaca held a firm telephone conversation with Mr. Formagus, and therein Mr. Mundaca explicitly stated that the Firm was in direct violation of Title VII, as it has refused to increase Ms. Rucker's salary to that of her White counterpart,

despite holding more experience, a larger caseload and a longer tenure with TSLF.

62.     Only after Mr. Mundaca's repeated advocacy and their obvious concerns that his complaints would escalate did the Firm finally agree to increase Ms. Rucker's salary, and on May 14, 2024, they issued a formal letter confirming the pay raise, effective June 1, 2024.

63.     By then, the Firm viewed Mr. Mundaca not just as a leader advocating for fairness, but as someone they needed to silence. Despite "promoting" Mr. Mundaca to Managing Partner in April 2024, leadership immediately began undermining his authority and retaliating against him.

64.     Before Mr. Mundaca's advocacy for Ms. Rucker, he played a key role in determining attorney bonuses, ensuring that pay increases and bonuses were awarded fairly based on performance. For example, at the outset, Mr. Mundaca was given a budget to allocate towards attorney salaries, and as a result, was also aware of every legal staff member's salary. His input directly influenced how bonuses were distributed, ensuring a fair and merit-based system.[2]

65.     However, after Mr. Mundaca successfully advocated for Ms. Rucker's salary increase, Mr. Spiggle and Mr. Formagus removed him from this process entirely. Specifically, Mr. Mundaca was told to rate attorneys on a scale of 1-5, no longer having information about how much the legal staff made or if their salaries increased.

66.     By the November 2024 bonus cycle, they had completely excluded Mr. Mundaca and did not ask for his input in the bonus process whatsoever. They took full control over bonus allocations and prevented Mr. Mundaca from participating in any compensation discussions, effectively silencing his ability to push for pay equity again.

---

[2] These conversations were frequently held via Gmail and Google Chat between Mr. Mundaca and Mr. Formagus.

67.    In October 2024, the Firm escalated its retaliation against Mr. Mundaca by further restricting his ability to grow his practice. Leadership prevented Mr. Mundaca from handling high-value cases in the business practice area and severely limited his ability to take new criminal matters by requiring that he single-handedly handle and appear for criminal matters, refusing to allocate any legal personnel towards these matters.

68.    Ultimately, Mr. Spiggle and Mr. Formagus eliminated both practice areas by December 2024, further undermining Mr. Mundaca's role.

### TSLF Retaliated Against Mr. Mundaca for Advocating for Racial Pay Equity by Terminating His Employment.

69.    In early December 2024, Mr. Spiggle invited Mr. Mundaca to breakfast. Unexpectedly, Mr. Spiggle questioned Mr. Mundaca's future at the Firm. Mr. Mundaca reaffirmed his commitment to and continuing to grow the Firm, even though Mr. Spiggle and Mr. Formagus had already privately determined that they would eliminate the practice areas that Mr. Mundaca had spent months developing.

70.    Despite Mr. Mundaca's continued dedication to the Firm, on January 10, 2025, the Firm terminated his employment.

71.    It was clear based on the timing that this was in direct retaliation for Mr. Mundaca's advocacy for pay equity and his refusal to remain silent about TSLF's discriminatory practices.

72.    When Mr. Mundaca asked for the reason for his termination, Mr. Spiggle stated, "I think our visions are different. We should separate." He had no real answers when Mr. Mundaca asked how his cases—many of which were filed under Mr. Mundaca's name—would be transitioned, because his only goal was to remove Mr. Mundaca as quickly as possible.

73.    Leadership fabricated pretextual reasons to justify Mr. Mundaca's termination,

but the truth was clear: they were happy to hire diverse talent to do the grunt work of the Firm's purported commitment to end discrimination, but when that diverse talent dared to demand equity within its own four walls, there would be immediate and swift retaliatory consequences.

74.     Mr. Mundaca's termination was the culmination of months of targeted retaliation. Instead of addressing the racial pay disparities Mr. Mundaca exposed, leadership silenced him, excluded him from decision-making, and ultimately terminated his employment. Their actions were calculated and deliberate, designed to send a clear message: standing up against discrimination, even within a Firm that claims to fight it, will result in unlawful retaliation.

### TSLF Failed to Pay Mr. Mundaca According to the Terms of the Origination Agreement

75.     The Origination Agreement entered into between Mr. Mundaca and TSLF on April 1, 2024, contained terms outlining TSLF's obligations, including but not limited to the following:

- Mr. Mundaca will receive 40% of the profit of all cases originating in New York and Texas unless and until the Firm has another attorney licensed to practice in those jurisdictions.

- Mr. Mundaca will receive 30% of the profit of all contingency cases originating in D.C., Maryland, or Virginia that are a direct referral to Mr. Mundaca.

- Mr. Mundaca will continue to receive 20% of the profit of all billable hours worked by Mr. Mundaca, excluding cases that receive an origination fee.

76.     Between April 1, 2024 and his termination in January 2025, Mr. Mundaca received origination payments for cases he personally worked on after contacting Mr. Spiggle and Mr. Formagus confirming each origination fee.

77.     However, after his termination, Mr. Mundaca discovered that there were other cases in which he earned origination fees, but for which TSLF never paid him.

78.     Following Mr. Mundaca's termination, Mr. Mundaca and Mr. Spiggle attempted to negotiate the Notice to be provided to TSLF's clients, informing them of his departure from TSLF. Mr. Mundaca expressed that TSLF should notify every client within the Firm of Mr. Mundaca's departure. Out of fear that the clients would opt to leave with Mr. Mundaca, Mr. Spiggle would only agree to provide eight of the more than 150 clients with the notice.

79.     In the days following the termination, Mr. Spiggle provided Mr. Mundaca with eight notices. Mr. Mundaca discovered that four of the eight clients fell into the four corners of the Origination Agreement. Specifically, Mr. Mundaca noted that there were clients within that group that Mr. Mundaca should have previously received 30% and 40% of generated revenue for, but TSLF never paid Mr. Mundaca these origination fees. In fact, one client expressed to Mr. Mundaca that she came to TSLF because of Mr. Mundaca's forensic background, and she was glad that she received notice of his departure.

80.     Upon learning of TSLF's level of deceit, minimization, and blatant breach of contractual obligations to Mr. Mundaca, it became clear that there are numerous other clients that TSLF realized revenue for but intentionally failed to pay Mr. Mundaca the related origination payments.

## CAUSES OF ACTION

### COUNT ONE
### Section 1981 and MFEPA
### Race Discrimination

81.     Mr. Mundaca incorporates by reference paragraphs 13 to 80 as alleged above.

82.     Section 1981 prohibits disparate treatment in employment on the basis of race and guarantees all citizens have "full and equal benefit of all laws . . . as enjoyed by white

citizens" without regard to race. 42 U.S.C. § 1981.

83.    MFEPA also makes it unlawful to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... race." MD Code § 20-606.

84.    Mr. Mundaca is a Latino man and a member of a protected class.

85.    Mr. Mundaca was an exceptional performer and leader over the course of six years and served as Managing Partner, making significant leadership, financial, and operational contributions to TSLF.

86.    TSLF intentionally subjected Mr. Mundaca to adverse employment actions because of his race, including but not limited to, refusing to promote him to Equity Partner, failing to compensate him in alignment with his duties as Senior Attorney, Managing Attorney, and Managing Partner, eliminating several of his practice areas, resulting in loss of business, clients, and income for Mr. Mundaca, and ultimately terminating Mr. Mundaca's employment.

87.    Additionally, TSLF leadership, specifically Mr. Spiggle and Mr. Formagus, both White men, intentionally excluded Mr. Mundaca from firm management and operational information and decisions despite Mr. Mundaca being the Firm's Managing Attorney and later Managing Partner who was solely responsible for overseeing litigation and managing firm operations.

88.    TSLF denied Mr. Mundaca the full and equal benefit of employment by treating him less favorably than his White counterparts.

89.    TSLF intentionally discriminated against Mr. Mundaca because he is Latino, in violation of Section 1981 and MFEPA.

90.    TSLF acted in a willful and wanton manner and in callous disregard for Mr. Mundaca's federally protected rights.

91.     As a direct and proximate result of TSLF's discriminatory conduct, Mr. Mundaca has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT TWO
### Section 1981 and MFEPA
### Retaliation

92.     Mr. Mundaca incorporates by reference paragraphs 13 to 80 as alleged above.

93.     Section 1981 prohibits retaliation against employees who complain about a violation of Section 1981 in the workplace.

94.     MFEPA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against an employee with respect to his compensation, terms, conditions, or privileges of employment, because the employee engages in protected activity and reports acts of discrimination. MD Code § 20-606.

95.     Mr. Mundaca engaged in protected activity in October 2023, December 2023, and April 2024, when he reported his concerns of racial pay disparities related to a Black female attorney's compensation being substantially less than her White counterparts to Mr. Spiggle and Mr. Formagus.

96.     A few months after Mr. Mundaca's initial complaints about this racial pay disparity, in March 2024, TSLF began instituting a retaliatory campaign against Mr. Mundaca. Mr. Spiggle and Mr. Formagus abruptly informed Mr. Mundaca that the opportunity for equity partnership was no longer available to him.

97.     Then in April 2024, TSLF leadership removed Mr. Mundaca from pay and performance related processes he previously participated in and led.

98.     In October 2024, the Firm escalated its retaliation against Mr. Mundaca by

21

restricting his ability to grow his practice areas, preventing him from handling various high-value cases in the practice areas he was brought into the Firm to develop.

99.    By December 2024, TSLF had eliminated Mr. Mundaca's specialty practice areas, intentionally stifling his career growth and earning potential.

100.    In January 2025, TSLF terminated Mr. Mundaca's employment because he advocated for racial pay equity at the Firm.

101.    The short temporal proximity between Mr. Mundaca's protected activity and TSLF's disciplinary actions against Mr. Mundaca, as well as the intervening retaliatory conduct, suggests a causal connection.

102.    TSLF intentionally retaliated against Mr. Mundaca because of his protected activity, in violation of Section 1981 and MFEPA.

103.    TSLF acted in a willful and wanton manner and in callous disregard for Mr. Mundaca's federally protected rights.

104.    As a direct and proximate result of TSLF's retaliatory conduct, Mr. Mundaca has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT THREE
### MFEPA
### National Origin Discrimination

105.    Mr. Mundaca incorporates by reference paragraphs 13 to 80 as alleged above.

106.    Title VII and MFEPA make it unlawful to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." MD Code § 20-606.

107.    Mr. Mundaca is Hispanic and a member of a protected class.

108.    Mr. Mundaca was an exceptional performer and leader over the course of six years and served as Managing Partner, making significant leadership, financial, and operational contributions to TSLF.

109.    TSLF intentionally subjected Mr. Mundaca to adverse employment actions because of his national origin, including but not limited to refusing to promote him to Equity Partner, failing to compensate him in alignment with his duties as Senior Attorney, Managing Attorney, and Managing Partner, and eliminating several of his practice areas, resulting in loss of business, clients, and income for Mr. Mundaca.

110.    Additionally, TSLF leadership, specifically Mr. Spiggle and Mr. Formagus, both White men, intentionally excluded Mr. Mundaca from firm management and operational information and decisions despite Mr. Mundaca being the Firm's Managing Attorney and later Managing Partner who was solely responsible for overseeing litigation and managing firm operations.

111.    TSLF denied Mr. Mundaca the full and equal benefit of employment by treating him less favorably than his White, non-Hispanic counterparts.

112.    TSLF intentionally discriminated against Mr. Mundaca because he is Hispanic, in violation of MFEPA.

113.    TSLF acted in a willful and wanton manner and in callous disregard for Mr. Mundaca's statutorily protected rights.

114.    As a direct and proximate result of TSLF's discriminatory conduct, Mr. Mundaca has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT FOUR
### Breach of Contract

115.    Plaintiff re-alleges and incorporates by reference paragraphs 13 through 80 as fully set forth herein.

116.    To establish a claim for breach of contract under Maryland law, a plaintiff must show a contractual obligation, breach of that obligation, and damages. *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020).

117.    In breach of its contractual and legal obligations, TSLF failed to compensate Mr. Mundaca as required by the Origination Agreement, including paying Mr. Mundaca 40% origination credit for various cases that originated in New York and Texas, and 30% origination credit for cases that originated in D.C., Maryland, and Virginia between April 2024 and January 2025.

118.    As a direct and proximate result of TSLF's material breaches to the Origination Agreement, Mr. Mundaca has suffered injuries, damages, and financial losses to be established at trial, and which continue into the future, including attorney's fees in bringing this claim.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a) declaring that the acts and practices complained of herein are violations of Section 1981 and MFEPA;

(b) enjoining and permanently restraining these violations;

(c) directing Defendant to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated;

(d) directing Defendant to place Plaintiff in the position he would have occupied but for Defendant's discriminatory treatment, and to make him whole for all earnings she would

have received but for Defendant's discriminatory treatment, including but not limited to wages, pension, interest, and other lost benefits;

(e) directing Defendant to pay Plaintiff compensatory damages for his mental anguish and emotional distress;

(f) directing Defendant to pay Plaintiff punitive and liquidated damages;

(g) directing Defendant to pay Plaintiff nominal damages;

(h) awarding Plaintiff pre- and post-judgment interest;

(i) awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

(j) granting such other and further relief as this Court deems necessary and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully Submitted,

*/s/ Melissa Washington*
Melissa Washington, Esq. (Bar No. 31698)
mw@washingtonfirmpllc.com
Desireé Langley (Bar No. 31691)
dl@washingtonfirmpllc.com
THE WASHINGTON LAW FIRM, PLLC
1050 Connecticut Avenue, Suite 500
Washington, D.C. 20036
Tel: 202-770-3440
Fax: 202-991-2992